COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  |  |  |
|---|---|---|
| C.B., | § | No. 08-14-00224-CV |
| Appellant, | § | Appeal from |
| v. | § | 112th District Court |
| TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, | § § | of Pecos County, Texas |
| Appellee. | § | (TC # P-11572-112-CV) |
|  | § |  |

## **O P I N I O N**

CB appeals the termination of his parental rights to his son, AG-B. The appeal is a companion case to Cause Number 08-14-00224-CV in which the mother of the child appeals the termination of her parental rights. Because the cases were tried together and are related, we will detail in both opinions the circumstances of each parent. Indeed, it was their ongoing relationship that created the basis for many of the opinions offered at trial.

Appellant first complains of the trial court's denial of a continuance and jury trial. In four other issues, he challenges the legal and factual sufficiency of the evidence to support the trial court's findings of the statutory predicates for termination. For the reasons that follow, we affirm.

1

# PARENTAL TERMINATION

A parent's rights may be involuntarily terminated through proceedings brought under Section 161.001 of the Texas Family Code. *See* TEX.FAM.CODE ANN. § 161.001 (West 2014). Under this provision, the petitioner must (1) establish one or more of the statutory acts or omissions enumerated as grounds for termination, and (2) prove that termination is in the best interest of the child. *See id.* Both elements must be established and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).

The natural right of a parent to the care, custody, and control of their children is one of constitutional magnitude. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *see also Santosky v. Kramer,* 455 U.S. 745, 758-59, 102 S.Ct. 1388, 1397, 71 L.Ed.2d 599 (1982) (acknowledging that a parent's rights to "the companionship, care, custody, and management" of their children are constitutional interests, "far more precious than any property right"). Not only is a parent's interest in maintaining custody of and raising her children "paramount;" it is quite possibly the oldest fundamental liberty recognized by our courts. *See In the Interest of M.S., E.S., D.S., S.S., and N.S.,* 115 S.W.3d 534, 547 (Tex. 2003)(noting that Texas courts recognize that "a parent's interest in maintaining custody of and raising his or her child is paramount"); *Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (in discussing the constitutional stature of parental rights, the United State Supreme Court said, "the interest of parents in the care, custody, and control of their children--is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *see also In re M.S.,* 115 S.W.3d at 549 ("Termination of parental rights is traumatic, permanent, and irrevocable."). Although parental rights are of constitutional

magnitude, they are not absolute.  *In the Interest of C.H.,* 89 S.W.3d 17, 26 (Tex. 2002)("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

### *Burden of Proof*

Because of the importance of parental rights, and the severity and permanency of termination, the quantum of proof required in a termination proceeding is elevated from a preponderance of the evidence to clear and convincing evidence.  *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391; *accord Holick,* 685 S.W.2d at 20-21; s*ee In re M.S.,* 115 S.W.3d at 547 and *In the Interest of D.S.P. and H.R.P.,* 210 S.W.3d 776, 778 (Tex.App.--Corpus Christi 2006, no pet.) (cases (recognizing that involuntary termination of parental rights is a drastic remedy which divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent.); *see also In the Interest of B.L.D. and B.R.D.,* 113 S.W.3d 340, 353-54 (Tex. 2003) (noting that because of the severity and permanency of termination, due process requires the party seeking to terminate parental rights prove the necessary elements by the heightened burden of proof of clear and convincing evidence).

"Clear and convincing evidence" means the measure or degree of proof that "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (West 2008); *see In the Interest of J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002); *see also In the Interest of J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007) (contrasting the standards applied in termination proceedings and the standards applied in modification proceedings). This intermediate standard falls between the preponderance of evidence standard of ordinary civil proceedings and the reasonable doubt standard of criminal

proceedings. *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979); *In the Interest of D.T.,* 34 S.W.3d 625, 630 (Tex.App.--Fort Worth 2000, pet. denied)(op. on reh'g). Although the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed. *Addington,* 588 S.W.2d at 570.

### Standards of Review

The Supreme Court has clearly articulated the applicable standards of legal sufficiency review in termination cases. Accordingly, we consider all of the evidence in the light most favorable to the trial court's finding, "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In the Interest of J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005), *quoting In re J.F.C.,* 96 S.W.3d at 266. We give deference to the fact finder's conclusions, indulge every reasonable inference from the evidence in favor of that finding, and presume the fact finder resolved any disputed facts in favor of its findings, so long as a reasonable fact finder could do so. *Id.; In re J.F.C.,* 96 S.W.3d at 266. We disregard any evidence that a reasonable fact finder could have disbelieved, or found to have been incredible, but we do not disregard undisputed facts. *In re J.P.B.,* 180 S.W.3d at 573; *In re J.F.C.,* 96 S.W.3d at 266. A legal sufficiency or no evidence point will only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *See Swinney v. Mosher,* 830 S.W.2d 187, 194 (Tex.App.--Fort Worth 1992, writ denied).

### *Statutory Predicates*

The termination order here was based on TEX.FAM.CODE ANN. § 161.001(D)(E)(N) and

(O), with the court finding that Appellant had:

- Knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child (subsection D);

- Engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers they physical or emotional well-being of the child (subsection E);

- Constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months (subsection (N); and

- Failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child (subsection (O)).

Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or

injury, or to jeopardize a child's emotional or physical health. *Doyle v. Texas Department of*

*Protective and Regulatory Services,* 16 S.W.3d 390, 394 (Tex.App.--El Paso 2000, pet. denied).

While endangerment means more than a threat of metaphysical injury or the possible ill effects of

a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or

that the child actually suffer injury. *Doyle,* 16 S.W.3d at 394. Subsections (D) and (E) differ in

one respect: the source of the physical or emotional endangerment to the child. *See In Interest of*

*B.S.T.,* 977 S.W.2d 481, 484 (Tex.App.--Houston [14th Dist.] 1998, no pet.); *In Interest of S.H.A.,*

728 S.W.2d 73, 83-84 (Tex.App.--Dallas 1987, writ ref'd n.r.e.). Subsection (D) requires a

showing that the environment in which the child is placed endangered the child's physical or

emotional health. *Doyle,* 16 S.W.3d at 394. Conduct of a parent or another person in the home

can create an environment that endangers the physical and emotional well-being of a child as required for termination under Subsection D. *Id.; see In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.--Fort Worth 1995, no writ)("environment" refers to the acceptability of living conditions, as well as a parent's conduct in the home). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.,* 280 S.W.3d 494, 502 (Tex.App.--Fort Worth 2009, no pet.). The fact finder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle,* 16 S.W.3d at 394; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 84.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle,* 16 S.W.3d at 395; *B.S.T.,* 977 S.W.2d at 484; *S.H.A.,* 728 S.W.2d at 83–84. The conduct to be examined includes what the parents did both before and after the child was born. *In Interest of D.M.,* 58 S.W.3d 801, 812 (Tex.App.--Fort Worth 2001, no pet.); *Dupree v. Texas Department of Protective & Regulatory Services,* 907 S.W.2d 81, 84 (Tex.App.--Dallas 1995, no pet.). To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Id.; In Interest of C.D.,* 664 S.W.2d 851, 853 (Tex.App.--Fort Worth 1984, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In Interest of K.M.M.,* 993 S.W.2d 225, 228 (Tex.App.--Eastland 1999, no pet.). The specific danger to the child's well-being need not be

6

established as an independent proposition, but may be inferred from parental misconduct. *In Interest of N.K.,* 99 S.W.3d 295, 300 (Tex.App.--Texarkana 2003, no pet.). Evidence of criminal conduct, convictions, and imprisonment and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *In re J.T.G.,* 121 S.W.3d at 133. Imprisonment alone does not constitute an endangering course of conduct but it is a fact properly considered on the endangerment issue. *Boyd,* 727 S.W.2d at 533-34; *In re R.W.,* 129 S.W.3d at 743-44. Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being. *See In the Interest of S.D.,* 980 S.W.2d 758, 763 (Tex.App.--San Antonio 1998, pet. denied). However, "the relationship of the parent and child, as well as efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in 'endangerment' under section 161.001(1)(E), even where the parent is incarcerated." *In the Interest of D.T.,* 34 S.W.3d 625, 640 (Tex.App.--Fort Worth 2000, pet. denied).

Pursuant to subsection (N), the Department alleged that Appellant had constructively abandoned his son. The elements of constructive abandonment are: (1) the child has been in the permanent or temporary managing conservatorship of the Department for not less than six months; (2) the Department has made reasonable efforts to return the child to the parent; (3) the parent has not regularly visited or maintained significant contact with the child; and (4) the parent has demonstrated an inability to provide the child with a safe environment. If there is no evidence of one or more of these elements, then the finding of constructive abandonment fails. *In re D.T.*, 34 S.W.3d 625, 633 (Tex.App.--Fort Worth 2000, pet. denied).

7

Finally, under subsection (O), the Department has the burden to establish that (1) the parent was ordered to comply with a family service plan as a result of the child's removal for abuse or neglect, and (2) failed to comply with the requirements of the family service plan.

### *Best Interest of the Children*

A determination of best interest necessitates a focus on the child, not the parent. *See In the Interest of R.F.,* 115 S.W.3d 804, 812 (Tex.App.--Dallas 2003, no pet.). However, there is a strong presumption that it is in the child's best interest to preserve the parent-child relationship. *Swate v. Swate,* 72 S.W.3d 763, 767 (Tex.App.--Waco 2002, pet denied). The Texas Supreme Court has enumerated certain factors which should be considered: the child's desires; the child's emotional and physical needs now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the individuals seeking custody; the programs available to assist those individuals to promote the child's best interest; the plans for the child by those individuals or the agency seeking custody; the stability of the home or proposed placement; the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and any excuse for the parent's acts or omissions. *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex. 1976)("the *Holley* factors"). Also, permanence is of paramount importance in considering a child's present and future needs. *Dupree,* 907 S.W.2d at 87.

### FACTUAL SUMMARY

Appellant and PAG are the parents of AB-G. PAG is the mother of five other children: 18-year-old twin girls (LM and AM)[1], another child whose name and parentage is unclear from the

---

[1] The twins, AG, MG, and AB-G have different fathers.

8

record[2], a 14-year old daughter (AP), and 2-year-old daughter (MG). Appellant and Mother moved in together when MG was only one month old.

### Mother's History

Mother has a history with the Department. In 1998 it found "reason to believe"[3] she had committed physical abuse of her daughter LM and in 1999 the Department found reason to believe she had physically abused both of the twins, who were then five years old. Multiple injuries were found to their faces and stomachs due to their mother's striking them with a belt. The Department records revealed that Mother lacked patience with the children and lacked developmental understanding of their needs. She would get angry when the children were hungry and had difficulty controlling the twins. Mother was under a lot of stress; she and her boyfriend were unemployed and had financial problems. There was spousal abuse and during this time she became pregnant. The children were removed and placed with relatives. Mother was ordered to complete individual counseling, family counseling, domestic violence classes and parenting classes. She completed all of her requirements and the children were returned to her in 2000. In 2005, allegations of physical abuse by Mother toward the twins and AG were ruled out. In 2007, she was in a relationship with a man whom the Department believed was physically abusing LM and displaying inappropriate and excessive discipline. While Mother remembered the man -- AP's father -- she did not remember the CPS investigation. The same boyfriend caused another investigation in January 2008 for neglectful supervision of the twins, then-aged 13, and AP,

---

[2] One witness referred to a child who was a sibling of the twins. Another witness testified that Mother had six children by five fathers. One of these statements cannot be true. It is most likely that this unidentified child is the result of the 1999 pregnancy mentioned above.

[3] "Reason to believe" means that the Department has a preponderance of evidence that abuse occurred under the Texas Family Code's definition of abuse or neglect.

9

then-aged 7. The couple was living in an unsafe environment where drug addicts regularly congregated. Mother had been warned to keep the children away "from this drug addict barn" but the family continued to live there. Mother was using heroin and CPS believed she was an unsafe caregiver. The children were at risk for injury due to Mother's ongoing drug abuse and poor parenting decisions. At that point, the twins were placed with their father and AP was staying with her grandmother. We cannot ascertain from the record where the unidentified child was during this time.

In March 2009, the Department received an intake alleging that Mother was using drugs. The Department believed her drug use could greatly diminish her capacity to care for the children. Department records report that she left one of the children with a known sex offender. A second intake alleged that the children were placed at substantial risk of serious harm because Mother was not providing adequate supervision. The third intake alleged Mother abandoned the children, leaving them with individuals who no longer wished to care for them and sought police assistance.

An investigation revealed Mother left the children with inappropriate caregivers. In one instance, the house burned down while the children were asleep. Mother continued to use heroin and the girls have seen her overdose at least twice. The twins were again placed with their father and AP was placed with her grandmother. Mother was in a rehabilitation facility in El Paso and had no access to her daughters. The report found that Mother had a criminal history including driving while intoxicated, theft by check, and possession of a controlled substance.

Mother also has a history of choosing partners who engage in domestic violence. Her relationship with the twins' father resulted in domestic violence, as did her relationship with AP's father. She was less forthright when discussing her relationship with Appellant. She claimed that here had been no physical violence in their relationship until MG was grievously injured. She

10

told the investigator in the emergency room that there had been no violence in the relationship although there had been a lot of arguing. She later admitted that he had slapped her and elbowed her in the eye, causing bruising. She admitted to slapping, scratching and biting Appellant.

At trial, Mother testified that she had been admitted to a drug rehabilitation program. She successfully completed one after four unsuccessful attempts. Her drug of choice each time was heroin but she has also used marijuana and crack cocaine. She stopped using heroin in 2010 but continued to use marijuana and crack until 2011.

Mother dated Appellant for one month before she moved in with him. MG was only one month old at the time. Tragedy struck just months later.

### The Tragedy of MG

In November 2012, Appellant was charged with injury to a child, a second degree felony enhanced to a first degree felony. He was convicted and at the time of the termination proceedings, the criminal case was on appeal. The charges arose out of injuries to MG who was then an eight-and-a-half month infant. She suffered a skull fracture and shaken baby syndrome while she was at home alone with Appellant. She also suffered a stroke from this injury and required extensive medical intervention in order to sustain her life, including G-tube feedings and a tracheotomy. She is partially paralyzed on her left side and still suffers from seizures and other neurological conditions. She has eye damage, is blind in one eye, and while the doctor has said she is unlikely to recover her vision, he has been unwilling to say that the damage is permanent. As she has grown older, she has experienced developmental delays: 53% adaptive delay, 46% expressive communication delay, 33% gross motor delay, and 60% fine motor delay. She receives speech, occupational, and physical therapy, and is receiving help in strengthening her left hand.

On the day Appellant was arrested, drug tests resulted in positive findings for marijuana, cocaine and methamphetamines. He admitted to marijuana and cocaine use, but denied ever using meth. He has never been convicted for drug use, although he was convicted for possession of 85 pounds of marijuana in 1996. He testified that it was not for his personal use. When asked whether he intended to sell it, he explained that "it was mostly transportation." He was placed on probation for seven years, but the probation was revoked due to his cocaine and marijuana usage. He was then sentenced to five years and ultimately served three years in the Texas Department of Corrections. Mother allowed Appellant to care for the infant even though she knew Appellant used cocaine and marijuana.

There was a dispute about her discovery that MG was seriously hurt. She first claimed that the child was in her swing and when she realized something was wrong, she attacked Appellant. He, in turn, claimed she attacked while he was holding the baby.

> Q: The truth is: The day of the -- the day that [MG] got injured, you were part of that, weren't you? You attacked him while he held her, and that is the reason she got injured; isn't that not true?
>
> Mother: That is not true.
>
> Q. How can you say that, knowing that you attacked her [sic] with him holding her?
>
> A. That is not true. Because the reason I attacked him was because I found my daughter in a different state. My daughter had her face pushed in. My daughter's head was in a different odd shape. My daughter was -- when I called her, my daughter was -- her eyeballs were going back, and she squeezed my finger. There was something terribly wrong with my daughter. Whenever I found that out about my daughter, I attacked this man because I knew that I had left him a perfect child; and when I left -- when I came back, that was my same child but she was hurt and he hurt her.

* * * * *

> I attacked him whenever he -- whenever I got there and I seen my child, I picked her out of the swing. He took her from me. So, the baby was going back and forth, back

12

and forth; and it wasn't in my thought -- when I attacked him, I was not thinking I'm going to attack [Appellant] while he's holding my child. It happened to -- when he took my child from me, he sat in the recliner and I was hovering over him and I seen the face -- the look on his face, which told me that. Because of him, [MG] was hurt. So, when he stood up, it happened to be that he had my child; and that's when I attacked him because my mother instinct of -- to protect my child -- that I was upset that he had hurt my child oversurpassed [sic] me. I mean, it was an instinct. That's what it was. It was instinct.

Q. An instinct that you forgot to mention to law enforcement and any medical personnel when they were treating your daughter for almost dying?

A. At the time because my head was just all where everything had happened. I didn't know what was going on. I mean, they had her -- I found my child in a state that, Wow, like, you would have to -- you would have to walk in my shoes through that to know what I'm trying to explain here.

As a result of MG's injuries, Appellant was forbidden to have contact with any of the children. AB-G was born in January 2013 and Appellant has seen him only once since his birth. There was also a CPS case opened on Mother due to MG's injuries and she began working with Family Based Safety Services. Eventually, CPS returned MG to Mother and placed one of the twins, LM, as the primary caretaker.

### *Removal of the Children*

On Sunday, April 21, 2013, the Department received a priority one intake alleging neglectful supervision of AB-G and MG. Mother had reportedly left the children alone in their apartment unsupervised. Law enforcement first responded to a call advising that the children were alone. They waited approximately ten minutes before Mother returned. She admitted to the case worker during questioning that she had left the two little ones with the twins and AG so that she could visit Appellant. One of the twins said that their mother had left the home after she and her sister did. But Mother showed the caseworker text messages from the other twin threatening that if she went to see Appellant, AB-G and MG would be left home alone and law

13

enforcement would be called. The Department was appointed temporary managing conservator of MG and AB-G on April 22, 2013 and the children were placed in separate foster homes.

The family service plan of May 15, 2013 contains the following:

[Mother] is not protective of [MG] and [AB-G]. She left them with inappropriate caregivers who in turn left them alone in the apartment. The children could have suffered from great harm and were placed at risk while being left alone. Case was staffed for emergency removal placed [sic] on [Mother] being unprotective and the children being very vulnerable due to age. The family has CPS history and were currently in open FBSS case and the department felt that risks could no longer be controlled. [Mother] may not be able to meet the children's immediate needs since she places her own needs above the needs of the children. [Mother] continues to be in a relationship with [Appellant] despite the fact that he caused serious injuries to [MG]. There was domestic violence between [Mother] and [Appellant]. [MG] is 1 year old and [AB-G] is 3 months old. Both of them are unable to self-protect due to their age. Both of the children rely on adults to meet all of their needs including dressing, hanging [sic], feeding, and all physical and emotional development is dependent upon the care they receive from others. [MG] is special needs due to the injuries she suffered from Shaken Baby Syndrome. She takes seizure medication every day twice daily. She also has a nurse that visits the home every day and she is in need of physical therapy due to the paralysis she suffered from the brain injury. [Mother] may be unable to meet the children's needs since she places her own needs above their needs. [Mother] is not protective in that she continues to be in a relationship with [Appellant] despite the fact that he caused [MG]'s injuries. [Mother] has limited support due to her negative relationships and complex family dynamic system. [Mother] has unrealistic expectations of the children in that she leaves them with inappropriate caregivers in order to meet her needs above her [sic] own needs.

Risk factors included Mother's admission that Appellant continued to be a major distraction in her life. There was a pattern indicating Mother exercised poor judgment. The caseworker described the home as chaotic. As a result, a family service plan was created, requiring Mother to: (1) successfully complete a drug and alcohol assessment; (2) be honest with the provider and actively participate in the assessment; (3) submit to and successfully complete a substance abuse treatment program and counseling if recommended by the substance abuse assessment; (4) successfully complete a psychological evaluation with provider Dr. Joe Jeffers and comply with any

14

recommendations; (5) participate in individual counseling and comply with any recommendations; (6) participate in a face to face mental health evaluation with MHMR and comply with any recommendations; (7) participate in random drug testing and alcohol testing at the request of the Department; (8) maintain appropriate relationships with people and develop an appropriate support system; (9) not associate with anyone who engages in or is involved in criminal activity or drug seeking/using behavior; and (10) not associate with anyone involved in domestic violence.

The Department investigator testified at trial about the circumstances of removal.

A: Her first explanation was that she had left the children in care of her younger daughter -- or the older daughter, twins [LM and AM] -- and then the younger 12-year-old at the time, [AP]. Her first explanation was that she had gone to tell [Appellant] to stop bugging her. They were upset because she was going to see [Appellant] because [he] had hurt [MG]. So, they were upset that she was going to see him. So, they basically left the children alone; and then they called 9-1-1.

Q. You said that was her first story for why she left. What was her second story?

A. The second one was that she went to go get money to buy baby wipes.

Q: And was that her last story?

A: No.

Q: And what was the next one?

A: That she had gone to --

Q: I understand that it's a -- it's a sensitive issue. So, let me just put it this way: Did she tell you -- I'm paraphrasing -- that she went to have sex with Mr. [B]?

A: Yes.

Q: Okay. If the older daughters, the caregivers essentially, set Ms. [G] up by leaving the children alone and then reporting to the police that it was she who had done that, does this still raise concerns for us about Ms. [G] in that scenario?

A: Yes.

15

The case worker then explained that ordinarily, a single incident would not be grounds for an emergency removal. This was different because Mother continued to be in a relationship with Appellant despite the injuries to MG and in disregard of the service plan that she not associate with anyone involved in domestic violence. The Department grew concerned that Mother would not protect the children. It also considered her previous CPS history because "history is the greatest predictor of future abuse".

### *Mother's Testimony*

Mother testified at trial. She claimed that she did not know Appellant was on drugs the morning of the MG's injuries because he did not act "funny" or "weird". She trusted him. When asked whether she continued her relationship with Appellant after her infant daughter was hurt, she replied, "[n]ot a relationship, no." But she admitted talking to him on a few occasions and continuing to have a sexual relationship with him. She explained that because she would never let him around her children, she would go to him at his hotel. She knew that she was not to have any contact with Appellant, but she continued to see him, although the reasons changed. On the day she left the little children with the twins, she planned to see Appellant because he had been stalking her and she had received 97 calls from him that morning. On other occasions, she wanted to ask him why he had committed this terrible act against her daughter.

> Q: Okay. So, let me get this straight. You would go over and you would actually approach [Appellant] at his hotel to ask him these questions, why he would hurt your child; and then somehow y'all would end up having sex?
>
> A: That's how it goes because that's humanity, and I can't -- I can't -- I really can't explain that either.

Mary McBride, the caseworker through most of the case, testified as to other reasons Mother had given for continuing her relationship with Appellant:

16

I was speaking with Ms. [G] about her relationship with [Appellant] and why she continued to have contact with him. I was -- had concerns about that. She said that she was hooked like she was blind. He had her under some spell. She was just hooked, and she couldn't see past that.

Q. So, basically, she said it wasn't her fault? Her behavior was not her fault --

A. Yes.

### *Retraction by One of the Twins*

AM testified at trial concerning her thoughts when she left the babies home alone. She wanted to hurt her mother because she was really upset that she intended to meet with Appellant. "So, I mean -- I guess you could say subconsciously my intentions were to harm her. You know, I had no intent of getting her kids removed." While her twin had threatened to call CPS before, she had not. She regretted they had argued that day before her mother left. AM wanted her baby brother and sister to be with their mother because that's where they needed to be.

And it's not fair that because of mine and my sister's actions, that they were taken away from her when she did nothing wrong to them. She was -- she's a good mother, and it's my fault -- mine and my sister's fault -- but I can only speak for myself, and it's completely my fault that they were taken away from her.

### *Psychological Testimony*

The court also heard testimony from Dr. Joe Jeffers, a clinical psychologist in private practice in San Angelo, Texas. He was asked to perform a psychological evaluation on all of the parents. Appellant did not participate.

Dr. Jeffers diagnosed Mother as a victim of child sexual abuse, a victim of adult sexual abuse by partner, and a victim of adult physical abuse by partner. Test scores indicated that she has a mental age of 16.8 years and an IQ of 87, a score that falls within the low average range of intellectual functioning. He recommended that she continue to participate in counseling and parenting classes and that she practice a relapse prevention plan because of her previous history of

17

drug dependency. He also recommended participation in Safe Place, which is an organization that specializes in information and education regarding domestic violence. This was important because she had been the victim of domestic violence both emotionally, physically, and sexually. He believed she needed a stable job and an adequate budget to be able to care for herself and her children.

In his opinion, she needed to demonstrate some consistent steady progress in participating and incorporating lessons from counseling, parenting, domestic violence classes -- not only to help protect herself, but to protect her children -- and to be a more effective parent. His two outstanding concerns were her decision-making skills and her judgment.

Dr. Jeffers related that domestic violence was a feature of Mother's relationship with the twins' father. The following exchange ensued:

Q. Would your assessment of her parenting abilities change if you knew that there was also domestic violence with the fathers of two of her other children?

A. It would be an additional concern, obviously. And, again, I think it would harken back to her perhaps broken radar as far as relationships are concerned, her difficulty of protecting herself and possibly not recognizing the traumatizing effects that children experience when they're exposed to domestic violence. So, even if the children were not physically abused -- and I believe one of hers was seriously abused -- children that grow up in that kind of environment suffer psychological effects and consequences -- as did, I believe, Mother, who was exposed to domestic violence as a child for the first six -- nine years of her life.

* * * * *

Q: Would you say that Ms. [G]'s past history of repeated drug use -- sort of serial drug use – serial domestic violence relationships, serial CPS involvement is an indicator of where she's likely to go from here?

A: It's -- it's not a positive predictor. It certainly reflects the difficulty that she had in the past with decision making and judgment skills and life choices.

Q: Does it raise the risk of that pattern continuing?

18

A: Of course, it does. Is it a guarantee?   No.

### *Father's Story*

Appellant testified that he was convicted of injury to a child, but the case was on appeal. On the day that MG was injured, he tested positive for marijuana, cocaine and methamphetamines. He admitted to using marijuana and cocaine, but despite the positive drug test, he denied ever using meth.   He described Mother smoking marijuana with him once in a while and using some crack cocaine.   She continued doing drugs after learning she was pregnant with AB-G.

Appellant claimed that when Mother was violent with him, AP would "grab" the baby and walk away.   When Mother would get in a fight with the twins, he was the one that picked up the baby and sat outside until Mother regained control.   "She got a bad temper on her."   Apparently, there was no physical abuse between Mother and AP.   Appellant believed that Mother's behavior was directly responsible for MG's injuries because she attacked him while he was holding the baby.   He was then asked about a continuing relationship with Mother:

Q: Sir, can you confirm or deny whether or not you had a continuing relationship with [Mother] after [MG]'s injuries?

A: Me and [Mother] had a relationship until the date that -- until the day I got arrested, back in August 8th of 2013; but we had a relationship. Even when she was in Odessa, we were having a relationship.

Q: Can you briefly describe that relationship to the Court?

A: That relationship between me and [Mother] was like a regular relationship. We used to -- we used to talk about the kids. We used to eat, order pizzas, and -- but one thing, she never gave me her phone number. She always had my phone number and called me private, like in a position of following me -- made -- putting me in the position, you know. And, yes, we did have a -- a loveable relationship, you know.

Q: Okay. And, again, this is after [MG]'s injuries when y'all –

A: After [MG] got -- after November 14th, 2012, yes, sir.

19

Q: And did this relationship include a sexual component, as well?

A: Yes, it included a -- a sexual, yes, sir.

Q: Do you think if you hadn't have been arrested at that time, the relationship would have continued?

A: Correct. It would be continuing to right now, I believe.

## RIGHT TO JURY TRIAL

In his first issue, Appellant references a pre-trial hearing at which he announced he was going to hire an attorney. His current attorney, Sandy Wilson, filed a motion to withdraw to which she attached a letter from Appellant asking that she "be terminated from his cases" and he sought another attorney. The motion to withdraw was denied. Apparently, Appellant had hired counsel for the criminal trial but not the termination proceedings. On the day of trial, Appellant told the trial judge that he was ready to proceed but that he had requested a jury trial. The trial court denied the request as untimely. At that point, Wilson indicated this was the first time she had heard her client mention a jury trial. There is in the clerk's record, however, a motion filed by Wilson on February 20, 2014, entitled Motion for Continuance of Jury Trial and Extending Placement of Children. The continuance was sought because of the upcoming criminal trial. The continuance was obviously granted because trial in this case did not begin until June 25th. The record contains no jury demand nor does it reflect payment of a jury fee.

A timely request for a jury *plus* a timely payment of the jury fee are essential to preserving the right to trial by jury. *Huddle v. Huddle,* 696 S.W.2d 895, 895 (Tex. 1985); *In re Lesikar*, 285 S.W.3d 577, 586-87 (Tex.App.--Houston [14 Dist.] 2009, no pet.); *Whiteford v. Baugher*, 818 S.W.2d 423 (Tex.App.--Houston [1st Dist.] 1991, writ denied). The request and payment of the fee must be made at a reasonable time before trial, but not less than 30 days prior to the date of

20

trial.   TEX.R.CIV.P. 216.   Even if we were to regard the motion for continuance as a jury demand, CB was not entitled to a jury trial because no jury fee was ever paid.   We overrule Issue One.

## SUFFICIENCY OF THE EVIDENCE

Because termination of Appellant's rights may be predicated on any one of the grounds found by the trial court we need not address all four.   We will focus on subsections (E) and will not address subsections (D), (N) and (O).   Accordingly, we overrule Issues 2 and 3.   In Issue 4, Appellant complains:

> The trial court abused its discretion in terminating [Appellant]'s rights because the evidence was legally and factually insufficient to support the finding that [Appellant] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child pursuant to section 161.001(1)(E) of the Texas Family Code and the evidence was legally and factually insufficient to support the finding that [Appellant] knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child pursuant to section 161.001(1)(D) of the Texas Family Code.

We have detailed at length the volatile and dysfunctional family environment as well as the injuries to MG.   Taking Appellant at his word that Mother attacked him while he was holding the baby, he never disputed Mother's testimony that Appellant called Mother to say the child had vomited.   Mother came directly home and found the baby in the swing.   Appellant does not dispute this either.   Mother found her daughter with "her face pushed in" and in a "different odd state" with her eyeballs rolling back.   She picked the child up out of the swing and Appellant took her from Mother.   He sat in the recliner while she hovered and when he stood, she attacked him. We cannot tell whether her actions worsened the injuries, but her testimony is legally and factually sufficient to demonstrate that the child had received some injuries by the time she arrived home. Appellant's criminal history, violent conduct, and admitted daily use of marijuana in a house full of children are legally and factually sufficient to determine that reasonable trier of fact could have

21

formed a firm belief or conviction that Appellant engaged in conduct that endangered the physical or emotional well-being of MG pursuant to section 161.001(1)(E). Appellant has seen AB-G only once and has no relationship with him. Because of the Department's efforts to protect the child, we do not know how Appellant will interact with his son. But his past conduct bodes poorly for the future. The conduct we examine includes what he did both before and after AB-G was born. *In Interest of D.M.,* 58 S.W.3d at 812; *Dupree*, 907 S.W.2d at 84. Moreover, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct. *Id.; In Interest of C.D.,* 664 S.W.2d at 853. His actions toward MG are relevant to predicting Appellant's behavior once he is released from incarceration. We overrule Issue 4 in its entirety.

## BEST INTEREST OF THE CHILD

In Issue 5, Appellant challenges the legal and factual sufficiency of the evidence supporting the trial court's finding that termination is in the child's best interest. AB-G is too young to have expressed where he wishes to live.

### *Testimony of Foster Mother*

We begin, then, with the testimony of his foster mother, who is a registered nurse. She is the cousin of MG[4] and has been married for six years. Her husband and family are supportive of her efforts. She has had possession of MG and AB-G since January 17, 2014. The family lives in Midland.

The foster mother testified that Mother visits every other Friday and Appellant does not call or visit as he is prevented from having access. She described 18-month-old AB-G as having adjusted well. He has learned to walk, his vocabulary is expanding, and he has few health or

[4] Because her initials are also MG, we will refer to her as the foster mother.

22

developmental problems. MG is two-and-a-half. She has adjusted and is doing remarkably well. She continues to need early childhood intervention services and her ability to walk and talk was delayed. MG sees doctors in Lubbock, including an ophthalmologist and a neurologist, once or twice a month. She also has a primary care physician in Lubbock and a pediatrician in Midland. She requires daily medications, including Keppra, which is to prevent seizures. She must take it until she has been seizure-free for one year. She also takes Pulmicort for asthma, and Albuterol. MG no longer has a feeding tube.

Foster mom has worked with patients in a nursing home that have similar needs and disabilities to what MG is facing. MG's father, the foster mother's uncle, has relinquished his rights to MG and testified that he believed it was in his daughter's best interest to live with his niece. She intends to adopt both of children and keep them together. She wants to help the children maintain contact with their other siblings and with Appellant's family. But AB-G is attached to her and to her family, who can provide the stability they need.

### *Testimony of Suzanne Bailey*

Bailey is the volunteer coordinator for Frontier CASA and guardian ad litem of AG-B. She believed that it would be in the best interest of the boy to terminate the rights of both parents and allow the foster parents to adopt him. She expressed concerns about returning the child to Mother based on her series of relationships that were somewhat dysfunctional, and many of them abusive. Bailey noted that Mother has six children by five separate fathers, an extensive history with CPS, and a criminal history as well. Bailey did not believe Mother possessed the skills necessary to keep her children safe. She likewise discounted the possibility of returning the child to Appellant. Even if his criminal conviction for injury to a child is overturned, Appellant would still have to complete all his services and have positive reports from his service providers to give

23

some indication of what his parental abilities would be.   Given Appellant's criminal history and drug usage, Bailey believed Appellant would not change his habits or patterns.

Bailey had visited the foster home twice:

A: The children are very happy there. They're bonded.   They're attached. They're thriving. It's – [AB-G] is a -- just a wiggly little boy, and [MG] is probably one of the most exquisitely beautiful little girls I have ever seen in my life. She's just simply strikingly beautiful.

Q. But is she happy?

A. Yes.

Q. Okay. And is she safe?

A. Yes.

Q. All right. Is there anything else that – as the guardian, that you need to bring to the Court's attention?

A. Well, I would -- I would like to point out in praise of [the foster mother] and her husband for their completely free choice to continue the medical care that [MG] has in Lubbock. That's very important not to start all over with new specialists in -- in Midland, but they choose to make that trip up there as frequently as necessary.   And [MG] needs that. She has extensive delays that need to be cared for, neurological deficits that need to be seen by a specialist. So, they're doing a great job with that.

### *Testimony by Mary McBride*

This caseworker felt that termination would be in the child's best interest because adoption offered permanency and stability.   His tender age factored into that decision.   She favored termination of Mother's parental rights based on her continuing pattern of creating endangering conditions and for continuing a pattern of endangering conduct.   Her pattern of selecting improper caregivers, dangerous and violent partners, drug usage, and instability were risk factors.   McBride testified that in the past two years, Mother had lived in six difference locations, some of which were shelters, relatives' homes, and a boyfriend's home.   She was living in Fort Stockton at the

24

time of trial. During the past 16 to 18 months, she had held four different jobs and none for longer than six months. McBride recommended termination of Appellant's rights based on his history of drug usage, possession and transport. Adoption by the foster parents was the best possible plan for long-term emotional and physical needs because the family is a "great source of stability for the children, and they're committed to having the children in their home and keeping them together long-term." It was also the best plan for protecting them from future emotional and physical dangers because it removes them from the "sphere of influence from the people who have hurt them before." McBride mentioned that the Department had returned MG to Mother and given her another chance to keep the child. But nearly all of her problems relate to her inability to accept responsibility for her own actions. She kept returning to Appellant because she "basically couldn't help herself."

### *Testimony by Mother*

Mother testified that the children are more bonded to her than the foster mother. When MG sees her, she smiles and wants to go with her. She "jumps to go get me" and clings to her when being returned to the foster family. AB-G is confused about coming and going and separation from his mother. Mother had kind words for the foster family, observing that "whenever I visit my children every other Friday, they're -- they look like they're properly taken care of. And they -- they seem to have affection for that family."

Mother then testified about her plans for the future. She intends to "pick the people that I hang out with that I have my children around by continuing with the lifestyle that I have changed for myself to better myself." She works forty hours per week with a set schedule of 2:00 p.m. until 10:00 p.m. She has Wednesdays and Fridays off so that she can work on her plan with CPS. Her boss gives her flexibility. She attends church regularly. Her father is a minister and she was

25

raised in a Christian family. She described them as a close family and her support system is her mother and father. She now puts her children first and their needs before her needs. She has a daycare system in place. If she regains her children, she will alter her schedule so that she can work during the morning. She has consistently visited with the children and her future plans are to stay sober. She purchased a vehicle with a monthly payment of $350. She earns $340 per week or $1360 per month. She receives $540 in child support for AG for monthly income of $1900. Her expenses include rent ($450) utilities ($80) and food. Mother believed that her monthly expenses were roughly $1065 which would be sufficient to care for the children. She has been in therapy to break the cycle of violent partners and has worked on anger management and appropriate discipline to develop relationship tools. She now feels like a new woman who is on a positive path. Ultimately she believed that it was in the best interest of the children to be returned to her.

### *Appellant's Testimony*

Appellant expressed his desire to be with his son in the event "I can beat the appeals in the near future." While he agreed that the foster family was taking good care of the boy, he explained:

> I know that the hands they're in right now -- they're good in the hands they're in right now. But I want my son to get to know the family, grow up with my family, and [MG] grow up with her family, you know. I mean, I understand the situation I'm in, as I said so many times; but my son, he never -- I mean, he gots to be my son. I believe -- my family gots the right to fight for my son like I do. In the near future, I know my son is going to be with me one of these days, yes, ma'am. That's it.

As for Mother's rights, Appellant explained that he believed "kids always supposed to be with their mom." When he saw how violent she was and that she blamed him for MG's injuries, he

now believes that Mother "is not supposed to have no children. . . I don't want her to have my child."

> I don't want her to have my child. I believe the children are in good hands with the -- [foster family], but I would also like to have my family to intercept and try to have my son. You know what I mean? And both families could -- could connect between the -- the two kids. I mean -- I mean, I lost my life; and then lose my son. You know? And besides I'm still appealing a criminal trial. You know? You never know what could have happen in that appealing trial. I 'm going to fight for my son. I'm going to fight for my life, and I'm going to fight for my son. No matter how many attorneys it takes, I'm going to fight for him.

Appellant also has an older son and step-son with whom he has a good relationship, as he does with his former wife. But neither his son nor step-son testified on his behalf.

*Analysis*

Balancing the *Holly* factors, we conclude that the emotional and physical danger to the child now and in the future weigh in favor of termination. The same is true for the emotional and physical needs of the child now and in the future. The evidence offers little insight into Appellant's parenting abilities given the injuries to MG and the absence of testimony by his older son. Once he is released, Appellant will still need to complete the programs required by the Department and we have little confidence in his commitment to that goal. As for MG's injuries Appellant blamed Mother. He blamed the chaotic conditions of the home on the twins. He denies domestic violence although the record reveals testimony of stalking and violations of a protective order. Applying the appropriate standards of review, we conclude that the evidence is legally and factually sufficient to support termination of Appellant's parental rights. We overrule Issue Five and affirmed the judgment of the trial court below.

27

December 9, 2014

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, J., and Barajas, C.J., (Senior Judge)
(Barajas, C.J., Senior Judge, sitting by assignment)