# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00541-CV

---

### M. L. and S. D., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 322,622, THE HONORABLE JACK WELDON JONES, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

S.D. (Mother) and M.L. (Father) appeal the order terminating their parental rights to H.C.-M.D.-L. (Child).[1]  In two appellate issues, Mother challenges the sufficiency of the evidence to support the jury's findings against her under the endangerment statutory predicates for termination and under the statutory best-interest requirement.  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2).  In a sole appellate issue, Father challenges the sufficiency of the evidence to support the jury's finding against him under the best-interest requirement.  We affirm.

## BACKGROUND

When Mother and Father began their relationship, Mother knew that Father was a convicted sex offender.  Around 2009, he had pleaded guilty both to online solicitation of a

---

[1]  We refer to some people in this opinion by initials, fictitious names, or aliases to protect privacy.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

minor—an officer who was posing as a 14-year-old—and to possession of child pornography. He has completed his sentence of six years' probation. When Child was born in November 2020, Mother was living with her two half-siblings, Kaila and Thomas Naylor.[2] Eleven people lived in the home from November 2020 to February 2021—Mother, Child, Kaila, Thomas, the Naylors' six children, and the Naylors' then-13-year-old daughter's daughter (the Naylor granddaughter). While living with the Naylors, Mother once asked the oldest Naylor son whether anything was going on and whether anything was hurting him.

Because Mother often had to work double shifts, Kaila was the primary caregiver for Child and the other seven children in the home, home-schooling the school-aged ones. Mother's absence for work meant that Thomas was sometimes home with Child while Mother was gone. Partly because Kaila was usually the only adult there, the home grew filthy. She admitted the "horrible" condition of the home, and Mother agreed that "the house had an overwhelming smell of urine" and was unsafe for children because of how dirty it was. For example in the bathroom, the "bathtub had pieces of feces in it." In February 2021, the Department of Family and Protective Services began investigating why the Naylor granddaughter was not being taken to regular medical appointments. After seeing the conditions of the home, they removed Child and all other children from the home, and Mother does not believe that the removal was wrongful. About five days later, the home burned down during Winter Storm Uri, and Mother later moved in with Father.

---

[2] Kaila is Mother's half-sibling by their mutual father, and Thomas is Mother's half-sibling by their mutual mother (Grandmother). Kaila and Thomas are not related by blood, but they grew up together in Grandmother's home, where Grandmother "raised [them] as siblings." Thomas first left their childhood home at age 16 because he was incarcerated. Grandmother agreed that Thomas, upon release "got out of jail and married his sister," Kaila. The news shocked Grandmother.

Before the February 2021 removal, the Naylors' daughter who has a daughter of her own had explained to Mother and others that she became pregnant at 11 years old after an unknown, hooded assailant raped her on her way home from school. However, it was soon discovered that Thomas actually fathered his own granddaughter. A genetic test later confirmed that the granddaughter was the product of first-degree-incestual parentage—either a parent or sibling of the Naylor daughter had impregnated her. The abuse had gone on undetected while Mother and Child lived with the Naylors.

The truth about Thomas's raping his daughter soon came to light, as did allegations that he had sexually assaulted two more of his daughters in the home. Thomas went on the run, deserting Kaila and the children, quitting his job, withholding child support from Kaila, evading arrest, and not showing up for any more hearings in the Department case involving his children.

After the removal, a Department caseworker placed Child with a foster placement. When she arrived at the foster home, Child was dirty, her "sleeper" was dirty, and she had dirt underneath her finger- and toenails. About two months later, the Department moved Child from the foster placement into the care of Mother's mother (Grandmother). But about seven months after that, Child was removed from Grandmother's care and placed back with the foster mother.

This second removal stemmed from calls made by Father to a Department caseworker after Father and Mother broke up. He told the caseworker that he and Mother had been letting Thomas stay with them and that Mother had been allowing Thomas to be around Child. Around the same time, Kaila cut off contact with Mother once Kaila, in her words, "saw [Mother] was still having contact with" Thomas. Mother admitted to staying in contact with Thomas and to letting him stay with her. Father explained that even after Thomas stopped showing up to his own court hearings, Father and Mother gave Thomas a place to stay while he was

3

couch-surfing.  The caseworker's concerns grew when she saw a video from Child's one-year-birthday party at Father's house, where it appeared Thomas was present, corroborating Father's allegations.  Mother and Father were also at the party.

Mother's statements about Thomas, both in conversations with Department personnel and during therapy sessions, changed over time.  She first denied that Thomas had come around her at all but later admitted that she let Thomas stay with her and Father one night and later again admitted multiple nights' stays but said that she would send Thomas away if Child was around.  According to the caseworker, the June 2022 trial in this suit was the first time Mother admitted that letting Thomas be near children would be a problem, maintaining before then that the allegations against Thomas had never been proven.[3]  The caseworker also explained that after Thomas stopped staying with Mother, Thomas stayed somewhere else nearby.

Department personnel went to Grandmother's trailer to remove Child and after hours of trouble finding Grandmother or Child, called in help from law enforcement.  They all returned the next day and found Grandmother and Child in the trailer.  While walking up to the trailer, a caseworker could smell cigarette smoke and saw litter.  In fact, Child herself gave off a strong odor of cigarette smoke—so strong that for a full day Child's coughs and sneezes smelled like smoke and it took the foster mother days of washing Child's hair several times to get the smell out.  The foster mother has kept Child ever since and is willing to keep her until the Department can find a permanent placement, possibly with Child's relatives in either Massachusetts or Connecticut.

---

[3] Grandmother testified at trial that she does not believe that Thomas sexually abused his daughters, in part because it had not yet been proven to her.

4

The Department filed this suit to terminate Mother's and Father's parental rights to Child. The trial court submitted questions to the jury concerning two statutory predicate grounds for terminating each parent's rights—Subsections (D) and (E)—and best-interest questions for each parent. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2). The jury answered all three questions concerning Mother in the Department's favor, and though it answered the Subsection (D) question about Father in his favor, it answered the Subsection (E) and best-interest questions about him in the Department's favor. The court rendered judgment on the jury's verdict, terminating both parents' rights to Child, and Mother moved for a new trial on the grounds that the evidence was legally and factually insufficient to support the findings made against her under Subsections (D) and (E) and best interest. The court denied Mother's motion, and both Mother and Father now appeal.[4]

## APPLICABLE LAW AND STANDARD OF REVIEW

To terminate parental rights, the Department must prove both (1) one of the statutory predicate grounds and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code § 161.001(b)(1), (2); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements by clear and convincing evidence. *See* Tex. Fam. Code § 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the

---

[4] After Mother and Father filed their notices of appeal, the trial court, on the Department's motion, signed an "Order Nunc Pro Tunc" to correct references to Child's name because of a misspelling. The Order otherwise contains the same content that the earlier judgment terminating Mother's and Father's parental rights contains. The court signed the Order while the court still had plenary power over its judgment, the Order is the final judgment in the suit, and we treat Mother's and Father's appeals as from the Order. *See* Tex. R. Civ. P. 329b(e), (h); Tex. R. App. P. 27.3; *LaGoye v. Victoria Wood Condo. Ass'n*, 112 S.W.3d 777, 783 n.7 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *accord In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002).

Legal-sufficiency review of the evidence to support termination requires reviewing all the evidence in the light most favorable to the finding under attack and considering undisputed contrary evidence to decide whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *See In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

When reviewing the evidence, we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). The jury is entitled to disbelieve any witness's testimony. *S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at \*15 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.). And it is the jury's role to draw any reasonable inferences from the evidence that it chooses and to choose between conflicting reasonable inferences. *See In re J.W.*, 645 S.W.3d 726, 745 (Tex. 2022); *B.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00118-CV, 2020 WL 5100641, at \*17 (Tex. App.—Austin Aug. 28, 2020, pet. denied) (mem. op.).

## MOTHER'S APPELLATE ISSUES

In her first appellate issue, Mother maintains that the evidence was legally and factually insufficient to support termination under either of the endangerment statutory predicates—Subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Termination under Subsection (D) requires that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See id.* § 161.001(b)(1)(D). Subsection (E) requires that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See id.* § 161.001(b)(1)(E). We often conduct evidence-sufficiency reviews under both these predicates simultaneously when, as here, the evidence relevant under each is interrelated. *See, e.g.*, *H.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00373-CV, 2022 WL 17169847, at *5 (Tex. App.—Austin Nov. 23, 2022, no pet. h.) (mem. op.); *V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).

For purposes of both predicates, "'[e]ndanger' means 'to expose to loss or injury; to jeopardize.'" *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "Although '"endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury,'" *id.* (quoting *Boyd*, 727 S.W.2d at 533), or even that the conduct happen in the child's presence, *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental

misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Id.* "As a general matter," however, "the relevant time frame" for Subsection (D) review is usually "before the child's removal 'since conditions or surroundings cannot endanger a child unless that child is exposed to them.'" *J.W.*, 645 S.W.3d at 749 (quoting *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied)). An exception exists for when the parent "cause[s] his child to be placed in an endangering environment after removal." *Id.* at 749 n.12. "Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *Pruitt*, 2010 WL 5463861, at *4.

The relevant inquiry under Subsection (E) is whether the endangerment of the child's well-being was the direct result of a person's conduct, including acts, omissions, or failures to act. *See T.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00174-CV, 2021 WL 4692471, at *6 (Tex. App.—Austin Oct. 8, 2021, pet. denied) (mem. op.); *In re J.F.-G.*, 612 S.W.3d 373, 382 (Tex. App.—Waco 2020), *aff'd*, 627 S.W.3d 304 (Tex. 2021). If the endangering person is someone other than the parent–appellant, then the parent generally must have known of the other person's endangering conduct. *See J.F.-G.*, 612 S.W.3d at 384; *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018), *pet. denied*, 579 S.W.3d 74 (Tex. 2019) (per curiam). "Termination under subsection (E) requires more than a single act or omission, and the Department must show a voluntary, deliberate, and conscious course of conduct by the parent, considering a parent's actions both before and after the child was removed from the home." *T.M.*, 2021 WL 4692471, at *6.

By contrast, the relevant inquiry under Subsection (D) is whether the child's environment, including the child's living conditions and conduct by parents or others in the home,

endangered the child's well-being. *V.P.*, 2020 WL 544797, at *4. "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home . . . is part of the 'conditions or surroundings' of the child's home under subsection (D)." *Id.*; *see In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment.").

The evidence here established two primary sources of endangerment through Mother's endangering conduct toward Child and knowingly allowing Child to remain in endangering conditions. First, the evidence established Thomas's continued presence near the Child and near Mother. The jury did not have to believe Mother's denials about Thomas's continued presence. *See In re E.V.V.M.-H.*, No. 01-18-00888-CV, 2019 WL 1388029, at *6 (Tex. App.—Houston [1st Dist.] Mar. 28, 2019, no pet.) (mem. op.) (evidence supported termination under Subsection (E) in part because evidence showed that "[a]s a result of the mother's activities," "possible sexual predators" had "easy access to her home," thus endangering child "because [mother] has created a potential for danger that she disregards"); *P.A.G. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 595, 609 (Tex. App.—El Paso 2014, no pet.) (stating in support of upholding Subsection (E) finding against parent, "Appellant's own conduct demonstrates that she lacks the capacity to ascertain danger to her children"). Second, the jury heard about the unsanitary condition of the home pre-removal. *See In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.) ("Unsanitary conditions can qualify as surroundings that endanger a child."); *accord Leal v. Texas Dep't of Protective & Regul. Servs.*, 25 S.W.3d 315, 325 (Tex. App.—Austin 2000, no pet.), *disapproved of on other grounds*, *J.F.C.*, 96 S.W.3d at 267 & n.39.

According to a caseworker's testimony, even after Mother knew about the reports of Thomas's raping his older daughter and sexually assaulting two more, Mother still allowed

Thomas to be around Child at the birthday party and still allowed Thomas to stay the night where Mother and Father lived. The caseworker and others testified about Mother's changing responses to the reports. Mother (and Grandmother as well) first denied outright that Thomas had done anything, then minimized Thomas's conduct, continued minimizing[5] it even after learning of the results of the genetic test, and then only at trial admitted that it would be a problem for Thomas to be near Child. The caseworker summed it up when she testified that before trial, both Mother and Father "never really indicated that it would be any problem for [Thomas] to be around" Child. Mother denied all this at trial, and her testimony was equivocal about when she first heard reports of Thomas's conduct, first agreeing that she heard them in September 2020 but later saying that she first heard them only after the February 2021 removal and not remembering the specific month. The jury was within its rights not only to disbelieve Mother's denials but also to infer from all the testimony that Mother disregarded or did not fully appreciate the danger that Thomas posed to Child. *See J.W.*, 645 S.W.3d at 745; *A.B.*, 437 S.W.3d at 503; *B.D.*, 2020 WL 5100641, at \*17; *S.C.*, 2020 WL 3892796, at \*15. We conclude under the applicable standard that the evidence was legally sufficient to support the Subsection (E) finding against Mother. *See E.V.V.M.-H.*, 2019 WL 1388029, at \*6; *P.A.G.*, 458 S.W.3d at 609.

The jury also heard testimony and saw exhibits about the unsanitary condition of the 11-resident home pre-removal. Not only did Department personnel testify about the home's condition, but Mother and Kaila also admitted how bad things had gotten. Mother admitted that "the house had an overwhelming smell of urine." She did not dispute that the removal was

---

[5] The caseworker added that both Mother and Father minimized Father's sex crimes as well, either by denying that they happened or by referring to them only as his being depressed or drinking too much, causing him to solicit for sex a person he thought was a minor.

appropriate because of the home's condition and knew that it was unsafe for Child because of how dirty it was. And Kaila added that the home was in fact in "horrible" condition. We conclude under the applicable standard that the evidence was legally sufficient to support the Subsection (D) finding against Mother. *See C.L.C.*, 119 S.W.3d at 392; *Leal*, 25 S.W.3d at 325.

Mother's factual-sufficiency challenges to both predicate findings depend on witness testimony, most especially her own. For example, she argues from her testimony that she only stayed in contact with Thomas to scold him and that she never let him stay with her when Child was around. But the jury was free to disbelieve all or any part of Mother's or the other witnesses' testimony and to choose the reasonable inferences from the evidence that it would credit above other, conflicting inferences. We may not invade these roles of the jury's and thus conclude that the evidence also was factually sufficient to support the Subsection (D) and Subsection (E) findings against Mother. We overrule Mother's first issue.

In her second issue, Mother maintains that the evidence was legally and factually insufficient to support the best-interest finding against her. Best-interest analysis "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. There is a strong presumption that a child's best interest is served by maintaining the parent–child relationship. *D.J. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00323-CV, 2020 WL 7395924, at *5 (Tex. App.—Austin Dec. 17, 2020, pet. denied) (mem. op.).

Our evidence-sufficiency review is guided by several non-exclusive factors taken from *Holley v. Adams*: (1) the child's wishes, (2) the child's present and future emotional and physical needs, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals in promoting the child's best interest, (6) the plans for the child by those individuals

11

and by the agency seeking custody, (7) the stability of the home or the agency's proposed placement, (8) the parent's acts and omissions that may indicate that the existing parent–child relationship is improper, and (9) any excuse for the parent's acts and omissions. *See* 544 S.W.2d 367, 371–72 (Tex. 1976). The Department need not prove all these factors, and the lack of evidence under some factors does not preclude a finding that termination is in the child's best interest. *See C.H.*, 89 S.W.3d at 27. "The need for permanence is the paramount consideration when determining a child's present and future physical and emotional needs." *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.). Evidence probative under the statutory predicate grounds may be probative of best interest as well, *A.C.*, 560 S.W.3d at 631–32, including especially evidence showing endangerment, *see C.H.*, 89 S.W.3d at 28; *V.P.*, 2020 WL 544797, at *8.

Evidence under the first factor—Child's desires—is lacking because Child was too young to express her wishes. She was only about one year and seven months old at trial.

Under the second, third, fourth, seventh, eighth, and ninth factors, we consider the evidence from the endangerment predicates. *See, e.g.*, *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (considering in best-interest analysis "parent's inability to provide adequate care for the child, lack of parenting skills, [and] poor judgment"). The jury reasonably could have believed that Mother hid Thomas's continued involvement in her life and knew that she needed to do so because she knew that letting him near Child was dangerous. *See Wischer v. Texas Dep't of Fam. & Protective Servs.*, No. 03-12-00165-CV, 2012 WL 3793151, at *8 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) ("The jury could reasonably have concluded that Wischer continued to exercise poor choices regarding her personal associations, which endangers her children's physical and emotional well-being now and in the future.").

Mother also minimized Father's sex crimes, by denying that they happened or by thinking of them only as his being depressed.

The jury also heard testimony about Mother's demanding work schedule leading up to trial and that Child was placed with Grandmother for a time. And the jury heard that Grandmother would continue to help Mother care for Child if Child stayed with Mother. Given these circumstances, the evidence about Child's health being harmed by Grandmother's care was relevant. *See C.F. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00250-CV, 2021 WL 5018839, at *9 (Tex. App.—Austin Oct. 29, 2021, pet. denied) (mem. op.) (stating in best-interest review that factfinder "may consider the consequences of its failure to terminate parental rights"). The caseworker who removed Child from Grandmother's care gave evidence about the quality of that care. She testified that when Child was removed from Grandmother's care, Child had dried food smudged around her mouth and "a very strong odor about her" of both cigarette smoke and an "odor that is commonly found in dirty homes." The caseworker had to take what was to her an extraordinary step of buying Child new diapers and pajamas "[b]ecause the odor on her was very strong," not dissipating "in any way" over "the six hours that" the caseworker had Child and matching the odor of the inside of Grandmother's trailer. Even with the new clothes, Child "still smelled of cigarette smoke." Plus, while changing Child's diaper, the caseworker saw "some discoloration around [Child's] vaginal and anal area," which mostly "appeared to be a diaper rash, but there was also what appeared to be some small bruising." This concerned the caseworker enough to ask the foster placement to have Child evaluated, including for sexual abuse. Although not the most severe that the caseworker had ever seen, the diaper rash "didn't look like it had been treated well." Once Child was with the foster placement, the foster mother found Child and her pajamas to be dirty and noticed that Child "reeked heavily of cigarette

13

smoke" to the point that when Child coughed or sneezed, the foster mother would smell smoke. Although the smell from coughs or sneezes cleared up after about a day, it took five days of washing Child's hair two or three times a day to get the smoke smell out. The foster mother took Child to the doctor for all this, but the doctor had no concerns. Finally, Grandmother was also at Child's birthday party, which Thomas attended.

Mother counters by pointing out that Child was always healthy, Mother was attentive and caring in her care of Child pre-removal and during her visits post-removal, Mother said she had never let Thomas be around Child and vowed never to do so, and that she had ended her association with Father. Evidence also showed that Mother completed nearly all of the tasks the Department set forth for her in her Family Service Plan, including completing a year of parenting classes, which Mother testified taught her many things. Mother found and maintained a new home, kept it clean,[6] and had the financial ability to care for Child.

These matters support Mother's arguments, but the jury was within its rights to discount many of them and to find that they were outweighed by the other evidence we have recounted. Other evidence showed an on-again-off-again relationship between Mother and Father that went on for years. Although she had ended things with him shortly before trial, the jury could have reasonably inferred that he would return to Mother's and Child's lives despite Mother's denials because of their past relationship. This inference combines with those from Mother's denials about Thomas, which the jury could have found not credible, to reasonably paint a picture of a caregiver too little concerned with the two men's histories of sexual predation of children. And as for the state of the home environment, that Mother's home was currently clean and

---

[6] Except, according to a caseworker, for unsanitary conditions surrounding a pet ferret.

14

appropriate did not require that the jury ignore entirely the state of the pre-removal home, which even Mother admitted was unsafe for children. In all, the evidence under the second, third, fourth, seventh, eighth, and ninth *Holley* factors supports termination.

Under the fifth and sixth factors, there was little evidence presented of the programs available to assist Mother, except that she undisputedly completed a year of parenting classes required by the Department and attended numerous required therapy sessions. The caseworker testified, however, that the therapy was not achieving all its goals because even in therapy Mother was not confronting the danger that Thomas posed to Child and initially was denying that Father had committed any crimes. The therapist's notes reveal that Mother at first denied that Thomas was around her at all but only lately admitted that he spent nights where she was staying. As for the competing plans for Child, the Department had undertaken interstate studies on some of Child's relatives in Massachusetts and Connecticut as potential permanent placements. The foster mother testified that she could serve as a placement pending something more permanent. Mother's plans involved her new home and her financial ability to care for Child. She had worked a demanding work schedule leading up to trial but switched jobs just before trial to a new one that had her work only during the day. The position does not provide health insurance, so she planned on finding an out-of-pocket plan for Child. The evidence under the fifth and sixth factors is at best for Mother neutral.

Despite the conflicting evidence, the evidence was sufficient for the jury to form a firm belief or conviction that it was in Child's best interest that Mother's parental rights be terminated. While Mother and her friends, her relatives in New England, and Grandmother all recommended keeping Child with Mother, it was the combined view of the Department

15

caseworker and the guardian *ad litem* that Mother's parental rights should be terminated. We overrule Mother's second issue.

## FATHER'S SOLE APPELLATE ISSUE

Father raises only one appellate issue—that the evidence was insufficient to support the best-interest finding against him.[7] But Father has failed to preserve that issue. To preserve a legal-sufficiency challenge to a judgment rendered on a jury verdict, a party must (1) move for an instructed verdict, (2) move for judgment notwithstanding the verdict, (3) object to the submission of the relevant issue to the jury, (4) move to disregard the jury's answer to the relevant vital fact issue, or (5) move for a new trial. *B.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00279-CV, 2022 WL 16842084, at *2 (Tex. App.—Austin Nov. 10, 2022, no pet. h.) (mem. op.) (citing cases). And to preserve a factual-sufficiency challenge to a judgment rendered on a jury verdict, a party must move for a new trial. *Id.* Nothing in the record shows that Father properly preserved his sole appellate issue, nor does he point to anything. We thus do not reach this issue.

---

[7] Father does not challenge the sole statutory-predicate finding made against him, under Subsection (E).

## CONCLUSION

We affirm the order terminating Mother's and Father's parental rights to Child.

_____

Chari L. Kelly, Justice

Before Justices Baker, Kelly, and Theofanis

Affirmed

Filed:   February 16, 2023