# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00104-CV

---

**E. J., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
NO. 22-0023-CPSC1, THE HONORABLE BRANDY HALLFORD, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

E.J. (Father) appeals from the trial court's decree terminating his parental rights to his two children, who were approximately five years old and three years old at the time of trial.[1] Father challenges the legal sufficiency of the evidence supporting the predicate statutory grounds for termination. *See* Tex. Fam. Code § 161.001(b)(1)(E) (endangering conduct), (N) (constructive abandonment), (O) (failure to comply with court order). He also challenges the factual sufficiency of the evidence supporting the best interest finding.[2] We affirm the trial court's termination decree.

---

[1] For the children's privacy, we will refer to them by aliases and to family members by their relationships to them or by aliases. *See* Tex. R. App. P. 9.8.

[2] The trial court also terminated the parental rights of the children's Mother. As part of an agreement with the Department, Mother stipulated, and the trial court found, that termination of her parental rights was in the best interest of the pursuant to Section 161.001(b)(1)(O) of the Texas Family Code. *See* Tex. Fam. Code § 161.001(b)(1)(O) (authorizing termination when parent has "failed to comply with the provisions of a court order" governing return of children). Mother also waived her right to appeal.

# BACKGROUND

On April 17, 2022, the Texas Department of Family and Protective Services (Department) received a report about a physical altercation between Mother and her roommate that culminated in Mother being arrested for pushing her roommate. Mother's roommate showed law enforcement a video recording of Mother dragging, hitting, and yelling at her older child; Mother admitted to hitting her child with excessive force but denied that she had left any marks or bruising. She also admitted to using marijuana and methamphetamine while her children were inside the home. The investigator later learned that Father did not live with or have contact with Mother because a protective order prohibited Father from being within 200 yards of, or communicating with, Mother and the children. The Department thereafter filed its original petition seeking termination of Mother's and Father's parental rights to the children on April 22, 2022. The Court entered an order the same day, removing the children from Mother's home and naming the Department the temporary sole managing conservator.[3]

The final bench trial commenced on February 7, 2023. Father did not attend the final hearing; his attorney of record explained that he attempted to contact Father through multiple communication media, and the trial court noted that Father was present when the final hearing date was set in open court. During the course of the proceeding, Father had been incarcerated, although he was released prior to the final merits hearing.

Erin Weaver, the Department conservatorship caseworker, testified that she last had contact with Father in the summer of 2022. Father attended his psychological assessment and one drug test, but Weaver explained that Father did not complete all of the activities under his service plan or the remainder of his drug tests. She explained that Father had not been

---

[3] Mother was subsequently charged with felony injury to a child and was prohibited from contacting the children during the pending termination proceeding.

involved since the beginning of the case. She explained that Father said "he would do anything, he wants to parent his children" but "then nothing would come to fruition." Weaver testified that Father suggested placing the children with his mother, but that placement was denied because the paternal step-grandfather "has previous CPS history involving his oldest son."

When discussing Father's service plan, Weaver clarified that Father completed only one of at least ten drug tests, which returned a positive result.[4] She also expressed concerns with Father using drugs because he "has a criminal history involving drugs" and a history of drug abuse. His service plan included a protective parenting skills course and individual therapy, but Father did not attend the parenting course or therapy, and Father did not provide a reason for not attending. Father originally did not have visitation because of the protective order, but once that order expired in September 2022, Father needed to engage in services and then "the child advocates could come back to the [trial court] with a recommendation on visitation, but [Father] never did." Weaver explained that the protective order was a two-year protective order that prevented him from having any visits, and that order ended during the course of the termination proceeding. Because Father never sufficiently engaged in services, visitations were never allowed. Weaver testified that Father has not sent any letters or gifts to the children, does not know their birthdays, and has not contacted her about asking to visit the children since the previous summer. On cross-examination, she clarified that the investigation leading to the removal of the children "wasn't done on [Father]." She also admitted there was no evidence Father had physically harmed the children and that her understanding was that the protective

---

[4] The record on appeal does not demonstrate what substance(s) returned a positive result on the drug testing, but testimony in the record reflects that Father had admitted he was going to a methadone clinic. *See In re T.J.R.*, No. 2-06-345-CV, 2007 WL 614085, at *5 (Tex. App.—Fort Worth Mar. 1, 2007, no pet.) (mem. op.) (per curiam) (noting that methadone is "an addictive opiate" sometimes used to treat other opiate addictions).

order was not because of any physical harm to the children. She also clarified that the protective order prevented Father from visiting, and that she agreed it prevented contact by Father including sending gifts or letters.

Weaver stated that Father was incarcerated for parts of the termination proceeding, but since his release, Father has not contacted her, responded to her messages, or provided an updated address. Weaver also testified that Father represented that he was self-employed as an electrician, but he never provided any pay stubs or other documentation of employment, and that Father never completed a drug and alcohol assessment. Father completed a psychological evaluation in July 2022, but he did not comply with psychological recommendations, which was required under the service plan. She also testified that Father did not attend a batterer's intervention program she referred him to, nor did he complete individual counseling with a therapist. As she explained, Father has not had anything to do with the children "[r]eally for most of their lives. I mean, he hadn't seen them in years—or at least a year if he followed the protective order for two years prior to [the Department] getting involved."

Weaver also testified that the children are currently separately placed, but they have regular visits and the Department is looking for a home where they may be placed together. She testified that the children are well, enjoying their visits with each other, and that they are "loved and cared for" in their current placements. Regarding potential placements, Mother suggested her sister, on whom the Department was undertaking an expedited home study, but otherwise there were no other maternal family members being considered at the time of trial. In response to a question regarding Father's potential plans for parenting the children, Weaver expressed that "I don't think he has one outside of his mom raising the kids and him visiting them there." She expressed concerns about the children's safety if returned to Father and

4

explained that Father had not done anything to cause her to believe he could provide a safe and stable home for them in the near future. Weaver stated that neither of the children's current placements can take both children, but that each of the placements individually are able to continue caring for the children separately until the Department finds a new placement.

When questioned about Father's endangering conduct, Weaver explained that "based on his initial drug tests and his lack of any other drug tests, that he was participating in a methadone clinic to some degree but he was also misusing drugs." She also testified that he had violence in his relationship with Mother, which was endangering to the children even though he did not directly commit violence against the children. Weaver testified that termination was in the best interest of the children because they "need stability and consistency," "need sober and attentive parents," and need to "be able to trust their caregivers to be appropriate and be able to be there when they need them."

On cross-examination, Weaver noted that the protective order related to a conviction for assault against a family member, covered both Mother and the children, and that she believed it was violence towards Mother and that "I don't think he ever physically abused the children that we have on record." Weaver testified that Mother described Father as "very violent, that she was afraid of the kids being with him," and that "she was afraid of seeing him." She emphasized that domestic violence by one parent against the other parent affects the children. In response to a question whether "[a] person engages in breaking the law and doing drugs and domestic violence" creates a danger for their child, Weaver responded "[y]es." She testified that Father has demonstrated he cannot provide a safe environment for the children based on his past, his lack of participation, and his incarceration.

5

Amy Zavala, the CASA volunteer, testified that the children are "doing beautifully" and that their current placements are the best place for them to be. She testified that termination was in the children's best interest because of Father's history—"the fact that he has not even seen the kids or been around the kids or been in the[ir] presence for most of" the children's lives. When asked whether the children know who Father is, Zavala replied "No," and that she did not think the children would know who Father was if his name was said in front of them.

After hearing closing arguments, the trial court found clear and convincing evidence that subsections (E), (N), and (O) supported termination, and that terminating Father's parental rights was in the children's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(E) (endangering conduct), (N) (constructive abandonment), (O) (failing to comply with court order provisions necessary to obtain return of child), (b)(2) (best interest finding). The trial court thereafter signed an order of termination memorializing its oral findings. This appeal followed.[5]

## STANDARD OF REVIEW

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds for termination and (2) it is in the child's best interest to terminate the parent's rights. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007.

---

[5] Father moved for new trial, which was denied by operation of law. After a request by Father, the trial court issued findings of fact and conclusions of law on March 10, 2023.

In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When determining legal sufficiency, we consider whether "a reasonable factfinder could form a firm belief or conviction that the finding was true" when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered. *Id.* at 631. When determining factual sufficiency, we consider whether "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

However, "an appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

## DISCUSSION

In his first three issues, Father challenges the legal sufficiency of the evidence supporting the trial court's findings under subsections (E), (N), and (O). We begin by analyzing the subsection (E) finding because of that finding's "significant consequences for future parental rights." *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam).

Subsection (E) "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *Id.* at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)).  That is, our analysis under subsection (E) "focuses on the parent's conduct and whether the parent engaged in a voluntary, deliberate, and conscious course of conduct that endangered the child." *A.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00526-CV, 2022 WL 627224, at *6 (Tex. App.—Austin Mar. 4, 2022, no pet.) (mem. op.).

For purposes of a parent's conduct under subsection (E), "endanger" means "to expose to loss or injury; to jeopardize." *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022) (quoting *Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).  "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (quoting *Boyd*, 727 S.W.2d at 533); *see also A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied).  When considering whether a parent's conduct was endangering under subsection (E), "the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied); *see also S.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00142-CV, 2021 WL 3437891, at *1 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.).  "Additionally, termination under subsection (E) must be based on more than a

8

single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *C.B.*, 458 S.W.3d at 582.

Father contends that the evidence is legally insufficient to support a subsection (E) finding because he was subject to a protective order from September 2020 through September 2022 that prohibited his contact or access to the children, and therefore he could not have endangered the children.

Contrary to Father's argument, the evidence relating to the protective order goes to Father's endangering conduct. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). The trial court considered extensive uncontested evidence regarding Father's past domestic violence against Mother. When asked about her discussions with Mother, Weaver relayed that Mother stated Father "was very violent, that she was afraid of the kids being with him, and that initially in the case we had their cases separated because of the court order and she was afraid of seeing him." *See J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." (quoting *In re J.O.A.*, 283 S.W.3d at 345 n.4)). The removal affidavit, which was admitted into evidence, detailed a May 2020 report received by the Department that Father had knocked Mother into the ground, "beat her, and strangled her" (the children were not present for this altercation). *See id.* ("Evidence of domestic violence is also relevant to endangerment, even if the violence is not directed at the child.").

The trial court also considered evidence of Father's criminal conviction for assault causing bodily injury-family violence and the protective order itself. *See id.* ("Evidence of a parent's criminal history, convictions, and resulting imprisonment may establish an endangering

9

course of conduct."). Just as we explained in *E.E. v. Texas Department of Family and Protective Services*, 598 S.W.3d 389 (Tex. App.—Austin 2020, no pet.), "the district court could have reasonably inferred [Father] had endangered the child's emotional well-being" by his multi-year absence from the children's lives and from his conduct necessitating the protective order, *id.* at 406. Father attempts to distinguish *E.E.* on the ground that the termination proceeding in that case arose from the same incident that lead to the protective order, *id.*, but the trial court may consider evidence of conduct both before and after the children's birth and before and after the children have been removed by the Department, *see M.L. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00541-CV, 2023 WL 2025710, at *4 (Tex. App.—Austin Feb. 16, 2023, no pet.) (mem. op.); *see also D.H. v. Texas Dep't of Fam. & Protective Servs.*, 652 S.W.3d 54, 59 (Tex. App.—Austin 2021, no pet.) (explaining "factfinder may consider conduct that occurred both before and after the child was born" when evaluating endangerment finding).

The record also reflects that the protective order expired in September 2022, and that the trial court had separately stated at an earlier status hearing that the protective order could be modified if Father engaged in services. Weaver testified, however, that Father never satisfactorily engaged in services, including failing to complete a drug and alcohol assessment, to comply with recommendations from a psychological evaluation, to sign required releases, or to attend almost all drug tests. *See In re J.A.V.*, 632 S.W.3d 121, 132 (Tex. App.—El Paso 2021, no pet.) ("Finally, a parent's inconsistent visitation may also be considered as part of the endangerment analysis, as can the parent's failure to participate in a service plan.").

Further, the evidence concerning Father's drug use history also constituted endangering conduct. *See In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); *see also*

10

*D.H.*, 652 S.W.3d at 60 ("In addition, a parent's drug use may support termination under subsection (E) because it exposes the child to the possibility that the parent may be impaired or imprisoned."). Weaver testified that Father had a criminal history involving drugs and was going to a methadone clinic, "which means that he has [a] drug history." The trial court heard testimony that Father had only completed an initial drug test in May 2022, which returned a positive result, and that Father failed to attend at least nine other drug tests. *See A.C.*, 577 S.W.3d at 699 ("A parent's illegal drug use may constitute endangerment under subsection (E)."). Weaver also testified that she informed Father that the Department considers missed drug tests "as a positive" result, and she then confirmed that Father still failed to attend "at least 90 percent" of his scheduled drug tests. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A factfinder reasonably could infer that [parent's] failure to submit to the court-ordered drug screening indicated [they were] avoiding testing because [they were] using drugs."); *accord G.S. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00342-CV, 2020 WL 6479017, at *5 (Tex. App.—Austin Nov. 4, 2020, pet. denied) (mem. op.).

Contrary to Father's contentions, there is legally sufficient evidence in the record that Father engaged in a course of conduct that endangered the physical and emotional well-being of the children. *See* Tex. Fam. Code § 161.001(b)(1)(E). Because we conclude sufficient evidence supports termination under subsection (E), we do not need to address the other predicate statutory grounds. *See In re N.G.*, 577 S.W.3d at 232 ("To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground."). We overrule Father's first three issues on appeal.

11

In his final issue, Father challenges the factual sufficiency of the evidence supporting the best interest finding. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever." *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pet. denied) (quoting *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.)).

We consider nine factors to determine whether termination is in a child's best interest: the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d at 631; *S.B.*, 654 S.W.3d at 255. The party seeking termination has the burden of establishing that termination is in the child's best interest. *See In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive; although one factor is not necessarily dispositive, in some instances evidence of a single factor may suffice to support the best-interest finding. *See Holley*, 544 S.W.2d at 371–72; *see also In re C.H.*, 89 S.W.3d at 27; *S.B.*, 654 S.W.3d at 255. Ultimately, the *Holley* factors focus on the child's best interest, not the parent's. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.).

12

Evidence proving one or more statutory grounds for termination also can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

Father argues that there is little or no evidence relevant as to each factor and that therefore there is not clear and convincing evidence that termination was in the children's best interest. But the *Holley* factors are not exhaustive, and "[t]he absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *Id.* at 27.

Furthermore, the record before us belies Father's argument. Although the children have not expressed their desires, the record demonstrates that Father has spent minimal time with the children within the last two years and that Father has not had anything to do with the children "[r]eally for most of their lives." *See J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00187-CV, 2022 WL 7163637, at *14 (Tex. App.—Austin Oct. 13, 2022, no pet.) (mem. op.) ("When children are too young to express their desires, the factfinder may consider evidence that the children have bonded with a foster family, are well-cared for by them, and have spent minimal time with a parent."). In contrast to their relationship with Father, testimony at the hearing demonstrated that the children are doing well in their current foster placements, have regular visits with each other, and are "very loved and cared for." Father was also convicted of assault causing bodily injury-family violence and was incarcerated for part of the underlying termination proceeding. *See J.G.*, 592 S.W.3d at 525 ("[A] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." (quoting *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.))). And the record contains evidence of Father's past drug usage, his repeated failures to

13

submit to drug testing during the termination proceeding, and the Department's ongoing concerns about Father's "pattern of criminal behavior, domestic violence, and ongoing drug use" that endanger the children. *See C.C. v. Texas Dep't of Fam. & Protective Servs.*, 653 S.W.3d 204, 218 (Tex. App.—Austin 2022, no pet.) (explaining that parent's history of substance abuse evidences endangerment because it "exposes the child to the possibility that the parent may be impaired or imprisoned" (quoting *D.H.*, 652 S.W.3d at 60)).

Ultimately, "it is well settled that stability and permanence are paramount considerations in evaluating the needs of a child." *S.B.*, 654 S.W.3d at 255. Although Father contends that he was unable to complete services because of the protective order, the record shows Father failed to engage in services even when those services would not have run afoul of the protective order—such as complying with recommendations from a psychological evaluation or attending almost all drug tests—or after the protective order had expired. *See In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.) (finding termination in child's best interest because of, among other things, parent's failure "to motivate [themself] to seek out available resources needed by [children] now or in the future"). Father also failed to complete either individual counseling or a batterer's intervention course as part of his service plan. Weaver also testified that Father did not contact her or return her calls after his release, and she therefore did not have any address for his whereabouts since his incarceration. Similarly, Father previously told Weaver he was self-employed as an electrician, but he never provided any documentation or pay stubs. The only testimony about Father's potential plans regarding the children was from Weaver, stating "I don't think he has one outside of his mom raising the kids and him visiting them there." *See C.C.*, 653 S.W.3d at 219 (stating parent's missed visitations, therapy appointments, and drug tests indicate their "unpredictability may extend to any contact

14

[the parent] would maintain with [children] if [they] were allowed to retain [their] parental rights"). In contrast, the Department described the success of the children's current foster placements and testified about the goals to seek a joint placement for both children. And Weaver testified that termination was in the best interest of the children despite the lack of a current permanent placement because of the children's need for "stability and consistency," to form secure attachments and trust their caregivers, and "to just be kids who get to be toddlers." *See E.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00469-CV, 2022 WL 17970222, at *11 (Tex. App.—Austin Dec. 28, 2022, no pet.) (mem. op) (comparing stability and permanence of Department's and parent's plans for child).

Reviewing the entire record, the trial court could have reasonably believed that termination was in the children's best interest. *See In re C.H.*, 89 S.W.3d at 27. Moreover, there is not any disputed evidence that is so significant as to prevent the trial court from forming that firm conviction. *In re A.C.*, 560 S.W.3d at 630. We conclude that this evidence is factually sufficient to support the trial court's finding that termination of Father's parental rights was in the best interest of the children. *See E.G.*, 2022 WL 17970222, at *11. We overrule Father's final issue.

## CONCLUSION

Having concluded there was sufficient evidence supporting the trial court's termination under subsection (E) and its best interest finding, we affirm the trial court's final decree terminating Father's parental rights to the children.

15

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed: June 23, 2023