# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00037-CV

### M.Y. and D.Y., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 395TH DISTRICT COURT OF WILLIAMSON COUNTY
### NO. 20-0090-CPS395, THE HONORABLE RYAN D. LARSON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

M.Y. (Mother) and D.Y. (Father) appeal from the trial court's order terminating their parental rights to Son and Daughter, who were five years old and three years old at the final hearing.[1] Father challenges the trial court's findings that the statutory grounds for termination exist under subsections (D), (E), (N), and (O). *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (N) (constructive abandonment), (O) (failing to comply with court-ordered family service plan). Mother's counsel has filed a motion to withdraw supported by an *Anders* brief, concluding that her appeal is frivolous and without merit. *See Anders v. California*, 386 U.S. 738, 744 (1967). Based on the foregoing, we affirm the trial court's termination decree as to both parents.

---

[1] For the children's privacy, we will refer to them by aliases and to their family members by their relationships to them or by aliases. *See* Tex. R. App. P. 9.8(b)(2).

## BACKGROUND

On November 24, 2020, the Department filed a petition for protection, conservatorship, and termination as to Son and Daughter, based on a referral received approximately one month earlier of allegations of domestic violence between the parents. On February 9, 2021, the trial court entered temporary orders appointing the Department as the temporary managing conservator of both children. The children were initially placed with Maternal Grandmother, but then later placed with Paternal Grandmother after concerns that Maternal Grandmother was allowing unsupervised contact by Mother and was disciplining the children physically.

The parents were each given separate court-ordered family service plans, and the original bench trial occurred over three days spanning from July to October 2022. *See M.Y. v. Texas Dep't of Fam. & Protective Servs.*, 667 S.W.3d 502, 505 (Tex. App.—Austin 2023, no pet.). On November 8, 2022, the trial court rendered an order of termination, finding that subsection (D), (E), (O), and (P)[2] statutory grounds and best interest supported termination of Father's and Mother's parental rights to the children and appointing the Department as the permanent managing conservators for the children. *See* Tex. Fam. Code § 161.001(b).

Both parents appealed the original termination order. *M.Y.*, 667 S.W.3d at 505. Among other challenges, Mother argued on appeal that the trial court erred by "terminating her parental rights without first providing notice to the tribal nations after the court was put on notice

---

[2] Subsection (P) concerns parental use of controlled substances in a manner that endangered the health and safety of a child coupled with either failure to complete a court-ordered substance abuse treatment program or continued abuse of the controlled substance after completion of a court-ordered substance abuse treatment program. *See* Tex. Fam. Code § 161.001(b)(1)(P). This ground was not reurged on remand and is not a basis for termination of parental rights in the order under review.

that the Children may be Indian children, without definitively determining whether the Children qualified for tribal membership, and without following the procedures and standards required by the [Indian Child Welfare Act (ICWA)]." *Id.* Father raised a similar challenge regarding the trial court's failure to follow the notice provisions of the ICWA. *Id.*

On April 21, 2023, this Court held that the trial court committed reversible error by failing to contact relevant Indian officials to ascertain the children's potential Indian status and failed to use the beyond a reasonable doubt standard pursuant to ICWA. *Id.* at 510. We reversed the judgment of the trial court as to both parents and remanded for further proceedings consistent with our opinion. *Id.*

After the case was remanded back to the trial court, notices were sent out to the various identified tribal nations, and representatives of those tribal nations confirmed that neither child was found to be registered or eligible to register as a member of a tribal nation. Neither parent received a new court-ordered service plan, although the parents did participate in some services during this time period.

A jury trial was then held from November 27 through 30, 2023. Numerous witnesses testified, including Kim Sullivan, the children's play therapist; Cyndel Shepherd, a Department investigator supervisor; several police officers; Teri Freeman, the Department caseworker supervisor; Kaylene Beck, the CASA worker; Paternal Grandmother; Father; and Mother.

Kim Sullivan, the children's play therapist, testified that the children initially exhibited "some pretty extreme emotional responses," including hitting other children and teachers, and she described Son as having "some very extreme startling responses." She explained such responses are consistent with childhood trauma, although her role was not to

3

identify the trauma but rather to help the children "to be functional now, to get over whatever it is." She also described Son as having strong elements of "trauma play," which Sullivan described as play "where it's not fun" but an appearance of "I must do this to get it out of my system." She also described Son as repeating the phrase "Open the door. Open the damn door" with "intensity." When asked whether that phrasing may be indicative of a child who has experienced, witnessed, or heard domestic violence, Sullivan responded, "I would say that could be very consistent."

Father and Mother's relationship began in 2017 and they confirmed they had a physical altercation within thirty days of the start of their relationship. Father testified that both parents hit one another but stated that Mother first punched him several times. Mother contended that Father was the aggressor, that she did not recall hitting Father, and that by the end of the altercation "I had two knots—swollen knots on my head."

Father and Mother married in 2018. Mother testified that Father was violent towards her after Son was born, but she did not leave and instead had Daughter with Father. When asked whether she ever feared for the possibility that Father could take her life, Mother responded in the affirmative. Mother sought an application for a protective order against Father in 2019. The affidavit in support of the protective order described Mother as the "victim of family violence" and referenced multiple instances of Father physically assaulting Mother, including one instance in which Father threw a plant at Mother, "flipped" her down the stairs, and kicked and punched her. Mother also testified that during the altercation, Father tried to go after Son and said to her "I'm going to ruin your life. I'm going to kill you. Fuck you and them"; the affidavit also reflected that Father "tried to go after our son as he threatened to kill him." Father confirmed that he and Mother "did flip down the stairs because she was on my

4

back and I fell," but Father otherwise disputed the other statements in the affidavit. An agreed protective order was entered on September 27, 2019, although Father clarified that he agreed to the order because it contained a clause stating Father "has not agreed to any findings made by the Court in this order nor to the truth of any underlying facts that support these findings." Father confirmed he was twice found in violation of the protective order because he continued to be around Mother, including spending approximately ten nights in jail when he was arrested once relating to violating the protective order.[3]

The parents had another altercation in October 2020, which led to the removal of the children. At trial, Father denied he hit Mother during that altercation, and he testified that Mother hit him. Mother confirmed she was named the aggressor, but she testified that Father had hit her multiple times during the altercation. A responding officer described the scene as "chaotic," confirmed the children were awake and present at the scene when he arrived, stated injuries on Father were consistent with Father's statements that he had been assaulted by Mother, and related that Mother told him that Father had "pushed her or shoved her" but that Father described it as "him just trying to get her back and away from him." Father testified that the altercation occurred "outside in the yard away from the home" and the children were sleeping inside. Father also conceded that he "can see where [the altercation] can be damaging to" the children.

The parents had another altercation in April 2021 after the children had been removed. Father testified that Mother again "put her hands on me." He testified that he did not "recall" how the argument started, but that "to defend myself, I might have pushed her off me or

---

[3] Father confirmed that in 2019 he also pleaded guilty to sexual assault in a case involving someone other than Mother. He later clarified that the case did not require registering as a sex offender and did not involve any restrictions on being around children.

something, but I didn't punch her." Mother testified that she could not remember if Father had punched, kicked, hit, or thrown something at her, but she did remember that he had "choked [her] or impeded [her] breathing." The responding officer to the April 2021 altercation testified that Father provided photographs showing some bruising and swelling, as well as a bite mark on his shoulder, and he related that Mother told him that Father had choked her and she bit him in response. Father confirmed that he requested the charges against Mother be dropped after both the October 2020 and April 2021 altercations.

Mother testified that the children were not around the parents during their altercations, that she did not recall the children experiencing the incidents personally, and that the children themselves were never physically harmed. She later clarified that during at least some arguments or physical altercations, the children would have been in the next room and that Son "definitely probably could have" heard the parents arguing. Father similarly testified that the children were never physically harmed in the domestic violence between the parents and that they "weren't even around the physical altercations." Father could not remember whether they have argued in front of the children but then later conceded that the children "probably heard us argue." Mother described her and Father's past relationship as a time when they were both in a bad position together when she was drinking alcohol excessively, both parents were using marijuana, and domestic violence was occurring. Mother also confirmed that she is an alcoholic.

When asked when their relationship had ended, Father testified that their relationship has been over since the children were removed in November 2020, but Father conceded that he and Mother had "mingled together" at times since then, including being intimate as late as July 2022. Mother testified that the relationship had been over since Father cheated, but she confirmed that the parents had been intermittently together, including in 2022

6

around their anniversary. She later testified that there has been no domestic violence since they have separated, although the parents would continue to get into arguments when seeing each other intermittently during this time period.

Father would later state that he was no longer the same person going through domestic violence issues because his life had changed after the children were removed. He testified that he has not had a drink in approximately three or four years, had not smoked marijuana in two years, and had not had CBD in "about a month and a half" before the jury trial. Father denied using any drugs other than marijuana. Father testified that he has no intention to get back into a relationship with Mother, and that Mother had filed for divorce approximately two or three years earlier but it had not yet been finalized.

Father confirmed he had a family service plan he reviewed with a caseworker, and he testified that he completed more than half of the plan requirements. He testified that the Department did not give him "a service plan all over again" after the case was remanded back to the trial court in 2023. Father testified that he was told "it wouldn't make a difference." Father later testified that the Department could have done more to assist him with services, that he had approximately "five to six, maybe seven" caseworkers throughout the removal proceeding, and that a caseworker had told him going through anger management courses was pointless. He later testified that the caseworker told him the anger management course "was not mandatory" and that "it was pointless to do anything." Father also testified that he blames himself "completely" for not completing his services.

Cyndel Shepherd, the supervisor for the original Department investigator, testified that the Department received an intake of neglectful supervision by the parents relating to the October 2020 altercation, and that when the Department contacted the parents, the parents

7

admitted they got into an argument after Father called Mother several racial slurs and Mother attacked him. Shepherd testified that the initial intake noted that the children were not present in the home, but the parents clarified that the children were asleep in the home and were taken to the neighbors next door after they awoke from the commotion. Shepherd testified that an emergency protective order was put in place that prohibited the parents from being around each other for thirty days, but during an unannounced visit several weeks later, the Department worker found both parents at the home with the children and Mother admitted to drinking. Shepherd testified that the children were thereafter removed and placed with Maternal Grandmother.

Teri Freeman, the Department caseworker supervisor, testified that Father's family service plan directed that Father attend drug testing, that father attended 18 out of 36 drug tests during the removal proceeding, that he tested positive for marijuana on 17 of the 18 drug tests he completed, and that the Department had asked him to abstain from drug usage. Freeman testified that a caseworker met with Father in May 2023 after the case was remanded back from this Court, and that based on her review of records, the caseworker referred Father to services "[b]ut I'm not sure if he decided to go with his own." She testified that Father completed about half of his services before the original bench trial, but since then, Father has completed "[n]othing that has been documented" besides a single drug test in August 2023 that was positive for marijuana. She also clarified that there were three caseworkers assigned to the case throughout its duration.

Paternal Grandmother testified that she had not seen the parents "be physical with each other" but she had seen them verbally arguing and "getting angry." She testified that she tried to talk Father and Mother out of being in a relationship "[m]any times." When asked whether it would surprise her that the parents had another violent altercation after the children

were removed, Paternal Grandmother responded, "It doesn't surprise me. It makes me sad." She testified that both parents "deserve better than what they've given themselves," which she described as "[v]iolent, hostile," and she confirmed the parents had not broken up through 2022. She expressed concern that "the pattern will keep going on and on and on, the back-and-forth, you know." When asked if she had seen either parent change in the last three years of the proceeding, Paternal Grandmother responded "[n]ot really" and explained that "they have not made enough changes that show that they were putting their kids first." When asked whether her son was the victim, she explained that "he was the victim of physical assaults" but "[t]hey verbally both were really hard on each other." When asked if she knew whether the children were in the vicinity or asleep when the parents fought, Paternal Grandmother explained that "the places that [Father and Mother] live at—actually all the places that I've known are very small. So, yes, the kids were within the vicinity of it. They may not have been directly in front of them, but, yes, they were in the vicinity." And she later confirmed that the domestic violence "[a]bsolutely" affects the children.

Kaylene Beck, the CASA worker, then testified that at a hearing she attended with the parents after the case was remanded, the parents spoke about their service plans and made comments of "what's the point . . . if they felt like [the Department] were still wanting to terminate, like, what the point was for them to continue services at that point." She testified that her understanding was that the parents did not receive new service plans after the case was remanded and that "it was a continuation of the previous services."

At the end of the hearing, the jury found by clear and convincing evidence that termination of Mother's and Father's parental rights was warranted on subsection (D), (E), (N), and (O) grounds and that termination of their rights was in the children's best interest. The jury

9

then found that the Department should be named the permanent managing conservators of the children. On December 28, 2023, the trial court rendered its order of termination, consistent with the jury's findings. Both parents have now appealed.[4]

## STANDARD OF REVIEW

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds for termination and (2) termination is in the child's best interest. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When evaluating legal sufficiency of the evidence, we consider whether "a reasonable factfinder could form a firm belief or conviction that the finding was true" when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered. *Id.* at 631. "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "[a]n appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re*

---

[4] Mother and Father each filed motions for new trial, which were denied by the trial court on February 27, 2024.

*C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

Accordingly, an appellate court must not substitute its own judgment for that of the jury, *In re C.E.*, 687 S.W.3d 304, 309 (Tex. 2024) (per curiam), and we must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses," *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). That is, jurors "may choose to believe one witness and disbelieve another," and we "cannot impose [our] own opinions to the contrary." *In re C.E.*, 687 S.W.3d at 309 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)).

## FATHER'S STATUTORY GROUND CHALLENGE

In four issues, Father challenges the finding that the record supports termination of his parental rights on subsection (D), (E), (N), and (O) statutory grounds. *See* Tex. Fam. Code § 161.001(b)(1)(D) (endangering conditions), (E) (endangering conduct), (N) (constructive abandonment), (O) (failing to comply with court-ordered family service plan). We begin our review with the trial court's two endangerment findings—endangering environment under subsection (D) and endangering conduct under subsection (E)—because those findings may have additional consequences for Father in future proceedings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d 230, 232–33, 237 (Tex. 2019) (per curiam) (explaining that only one statutory ground is necessary to affirm termination of parental rights

but recognizing due process concerns require appellate review of (D) and (E) statutory grounds); *see also In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024) (stating that "we must also review termination under subsections (D) and (E) because a finding of termination under those grounds may justify termination of parental rights to other children under subsection (M)").

Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (quoting Tex. Fam. Code § 161.001(b)(1)(D)). Subsection (E) focuses on a parent's conduct and "allows for termination of parental rights if clear and convincing evidence supports that the parent 'engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.'" *In re N.G.*, 577 S.W.3d at 234 (quoting Tex. Fam. Code § 161.001(b)(1)(E)). Because the evidence pertaining to subsections (D) and (E) is interrelated, we consolidate our review of the evidence. *See V.P. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00531-CV, 2020 WL 544797, at *4 (Tex. App.—Austin Feb. 4, 2020, no pet.) (mem. op.).

Although the jury found by clear and convincing evidence that subsection (D) and (E) statutory grounds supported termination of Father's parental rights, Father contends that those statutory grounds could not support termination because of confusion as to whether Father should have been provided a new service plan (or if the original service plan remained required) when the proceeding was remanded after his original appeal. *See M.Y.*, 667 S.W.3d at 510. Father's argument, however, is unavailing. Whether a parent has complied with (or has the ability to comply with) a court-ordered family service plan is not the relevant analysis for

12

subsection (D) or (E); rather, the focus of subsections (D) and (E) is *endangerment*.[5]  When considering whether clear and convincing evidence supports subsection (D) or (E) grounds, our analysis focuses on whether the child's environment or the parent's conduct is "endangering,"— that is, exposes the child "to loss or injury; to jeopardize."  *In re J.W.*, 645 S.W.3d at 748 (quoting *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury."  *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam) (quoting *Boyd*, 727 S.W.2d at 533); *see also A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 699 (Tex. App.—Austin 2019, pet. denied).

For purposes of analyzing an endangering environment under Subsection (D) of the Texas Family Code, "[t]he child's environment refers to the suitability of the child's living conditions as well as the conduct of parents or others in the home."  *In re E.A.R.*, 583 S.W.3d 898, 908 (Tex. App.—El Paso 2019, pet. denied).  "A child is endangered when the environment creates a potential for danger and the parent is aware of the danger but consciously disregards it." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home under [Sub]section D."  *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  Moreover, "[a] single

---

[5]  Father's argument in effect seeks to replace the endangerment standard used in analyzing subsection (D) and (E) grounds with the standard used when analyzing a challenge to subsection (O) grounds.  *See* Tex. Fam. Code § 161.001(b)(1)(O) (failing to comply with court-ordered service plan).

act or omission can support termination under subsection (D)." *J.G. v. Texas Dep't of Family & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.).

For purposes of analyzing endangering conduct by a parent under Subsection (E) of the Texas Family Code, "the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied); *see also S.R. v. Texas Dep't of Family & Protective Servs.*, No. 03-21-00142-CV, 2021 WL 3437891, at *1 (Tex. App.—Austin Aug. 6, 2021, no pet.) (mem. op.). "Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *C.B.*, 458 S.W.3d at 582.

Even if we construe Father's argument as challenging the legal and factual sufficiency of the evidence supporting the findings of endangering conduct and endangering environment, the record belies that assertion. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *J.G.*, 592 S.W.3d at 524 (quoting *In re J.O.A.*, 283 S.W.3d 336, 345 n.4 (Tex. 2009) (citation omitted)). Neither Father nor Mother disputed that domestic violence between them occurred throughout their relationship, spanning multiple separate instances from thirty days into their relationship through times after the children had been removed. *See J.G.*, 592 S.W.3d at 524 ("Evidence of domestic violence is also relevant to endangerment, even if the violence is not directed at the child."). Although the jury heard testimony that the physical altercations between the parents never occurred directly in front of the children, there was also testimony that the children were in the vicinity of the altercations and that Son repeated the phrase "open the damn

door" and exhibited signs of trauma response in play therapy sessions. *See id.* (explaining that domestic violence "may produce an environment that endangers the physical or emotional well-being of a child" supporting termination under subsection (D) (quoting *In re P.W.*, 579 S.W.3d 713, 727 (Tex. App.—Houston [14th Dist.] 2019, no pet.))).

Although in his testimony, Father generally presented himself as the victim of Mother's physical violence, other evidence in the record—including Mother's affidavit in support of her application for a protective order in 2019 and her testimony—could have been reasonably weighed by the jury as showing Father was also at times the aggressor and had committed physical violence against Mother. *See In re C.E.*, 687 S.W.3d at 309. Furthermore, evidence showed Father repeatedly dropped criminal charges brought against Mother after various altercations, that domestic violence was present throughout the entirety of their relationship, and that Mother and Father were unable to end their tumultuous relationship for years even after the children had been removed. *See In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("[A] parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children."); *see also J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00187-CV, 2022 WL 7163637, at *12 (Tex. App.—Austin Oct. 13, 2022, no pet.) (mem. op.) (concluding that parent's refusal to live separately from other parent "despite evidence of extensive domestic violence" and "minimizing the severity" of other party's violent conduct supported endangering environment finding).[6]

---

[6] Father also admitted to past marijuana use and continued to test positive for marijuana on almost all of his drug tests after the children's removal. *See In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) ("Continued illegal drug use after a child's removal is

Viewing all the evidence under the applicable standards of review, we must conclude that it was legally and factually sufficient to support the endangerment findings against Father. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 630–31. Thus, we overrule those two issues and therefore do not address his additional issues challenging the evidence supporting the (N) or (O) statutory grounds. *See In re N.G.*, 577 S.W.3d at 232–33.

## MOTHER'S *ANDERS* BRIEF

Mother also appeals the trial court's final order terminating her parental rights to the children. *See* Tex. Fam. Code § 161.001.

Mother's court-appointed attorney has filed a motion to withdraw supported by an *Anders* brief, concluding that the appeal is frivolous and without merit. *See Anders*, 386 U.S. at 744; *In re P.M.*, 520 S.W.3d 24, 27 & n.10 (Tex. 2016) (per curiam) (approving use of *Anders* procedure in appeals from terminations of parental rights). The brief meets the requirements of *Anders* by presenting a professional evaluation of the record demonstrating why there are no arguable grounds to be advanced on appeal. *See* 386 U.S. at 744; *Taylor v. Texas Dep't of Protective & Regul. Servs.*, 160 S.W.3d 641, 646–47 (Tex. App.—Austin 2005, pet. denied). Appellant's counsel has certified to this Court that he has provided Mother with a copy of the *Anders* brief and motion to withdraw and advised her of her rights to examine the appellate record and to file a pro se brief. To date, Mother has not filed a pro se brief. The Department has filed a response to the *Anders* brief, stating that it will not file a brief unless requested by this Court.

---

conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under subsection (E).").

16

Upon receiving an *Anders* brief, we must conduct a full examination of the record to determine whether the appeal is wholly frivolous. *Penson v. Ohio*, 488 U.S. 75, 80 (1988); *Taylor*, 160 S.W.3d at 647. We have conducted an independent review of the entire record, including the *Anders* brief submitted on Mother's behalf. We have found nothing in the record that might arguably support an appeal, and we agree the appeal is frivolous and without merit. We have specifically reviewed the findings as to Mother under subsections (D) and (E) of Family Code section 161.001(b)(1), and we have found no nonfrivolous issues that could be raised on appeal with respect to those findings. *See In re N.G.*, 577 S.W.3d at 237. Accordingly, we affirm the trial court's order terminating Mother's parental rights.

However, the Supreme Court of Texas has held that the right to counsel in suits seeking the termination of parental rights extends to "all proceedings in th[e Supreme Court of Texas], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d at 27. Accordingly, counsel's obligation to Mother has not yet been discharged. *See id.* If after consulting with counsel, Mother desires to file a petition for review, her counsel should timely file with the Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *See id.* at 27–28. Counsel's motion to withdraw therefore is denied.

## CONCLUSION

We affirm the trial court's final order terminating Father's and Mother's parental rights to the children.

_____

Darlene Byrne, Chief Justice

17

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed:   July 3, 2024